Case 22-5053, U.S. v. Phillips. Mr. Campbell, are you ready to proceed? Your Honor, I'm John Campbell, the attorney for Michael Lamont Phillips, who is the appellant in this case and the defendant in the District Court v. the District Court of Oklahoma. In this case, Mr. Phillips went to trial on a two-count indictment. He was acquitted on the second count, which involved an allegation that he possessed a firearm, and on the first count, which was a possession of a chocaine base, the jury found him guilty. If it pleases the Court, I'd like to go through sort of the timeline of what is reflected in the body cameras of the two arresting officers and point out instances where the body camera reflects facts that are different from what was testified to the court, and also some facts that would be different from factual findings that the trial judge, Claire Egan, You realize you have a pretty heavy burden to show Claire error by the District Court on this. I do, Your Honor, and I recognize that's probably the weakest, my first argument about whether or not she committed error in denying the motion to suppress is probably my weakest argument, but I brought that in this appeal because I think the body camera video shows that some of the testimony that's offered by the arresting officers that the judge relied upon is not true. Specifically, for some reason, they claimed that my client was driving at high speed in a line of tacos. They said three to four tacos long, and if you watch the body camera videos, specifically Officer Schneider's body camera video, it starts basically at the point where he's doing a U-turn to come back and follow this alleged line of tacos. His acceleration to catch up to my client would have necessarily made him pass these other vehicles. My client pulls off in a parking lot. He stops behind him. When he gets out of the vehicle, his body camera points down the highway, and you can see for a long distance that there are no tacos driving off into the distance. Then after he's coming back from his initial confrontation with my client, you can see back down in the other direction, and there's no place where these tacos would have pulled up. So I think it's clear from the body camera videos that there weren't a line of tacos. I have no idea why they would have made up that story. Or the line of what? Of tacos, Your Honor. Of tacos. Of vehicles. The other thing that both the officers said that they knew my client from prior interactions, if you look at Officer Mortensen's video, at about the 20-minute mark, he asks my client what his name is. And then a few minutes later, he says, you look familiar to me. Do I know you from somewhere? And then it occurs to him that he knows him from an earlier prosecution done by an Officer Dupler. And he asks him about that, asks him how it turns out. My client says he was acquitted. And then Officer Mortensen gets out of the car and calls Dupler and starts talking to him about his investigation. Another issue, if you, Judge Keegan found that Officer Snyder had talked to the owner of the parking lot, and that owner had expressed concern about my client parking there. If you look at the body camera video, the decision to do a search occurs several minutes before he has any conversations with the person that owns the parking lot. And at that time, he doesn't actually ask him if he's concerned about my client parking there. He just makes the statement, we're going to get these cars out of your way. And the guy concedes to that. He said, that's fine. If you look at the body camera video, Judge Keegan says that it partially blocks the driveway, which arguably is true, but there's certainly, it's a fairly large parking lot, and there's a fairly large entrance and exit to that parking lot. So I don't think there's really any substantial blockage that is occurring to this parking lot. But Judge Keegan was relying upon Officer Snyder telling her the truth, and he was either mistaken or just outright didn't tell the truth. So, Counsel, just to be clear on how these points you're making connect up to the issues you presented, this last point goes to whether the search was a proper inventory search? Yes, Your Honor. And then the previous points go to whether this was a valid traffic stop? Yes, Your Honor. All right. So, while I do acknowledge her denial of a motion to suppress, I have a huge burden here. I thought it was important to bring some of these issues to the court, because when you look at the totality of the circumstances in the rest of the video, you'll see that there are some major discrepancies between what occurred on video and what these two officers told the trial court judge. So, if you look at the video, I would say Officer Snyder's video is the most useful. The pursuit to arrest my client is just the first 30 seconds. Within two minutes of his detention, he discovers a traffic warrant. When he comes back to the car to advise my client that there's a traffic warrant, at that point, Officer Mortensen advises Officer Snyder that he had asked for an attorney, and both of the officers give him a little bit of grief about that. You can see from Officer Snyder's body camera that the window on Officer Mortensen's side of the car, because he's on the passenger side of the vehicle, hits him about the eyebrow level, which is significant because Officer Mortensen is the one that does a probable cause search without communicating at all with Officer Snyder about whether or not he had any probable cause to do a search. All of the probable cause decisions would have to fall on Officer Mortensen because there's no discussion about whether or not Officer Snyder smelled any marijuana or smelled any alcohol or anything like that. And Officer Snyder's the one that's standing next to my client with the window always down and talking to him. Now, on these cameras, on the videos, can you tell if there are any hand signals or nods or things like that? For example, the owner of the parking lot signaling something about get this car out of the way or one of the officers saying to the other, signaling in some way that he should search where he had smelled stuff. Can you tell that from the video? Your Honor, I did not see any sort of nonverbal cues. But the video would have shown any such cues you're saying. You could see the officers. You could see the people in the parking lot. Yes, Your Honor. They both left their cameras running, including the audio, from basically the time they pulled into the parking lot until, in Officer Snyder's case, he arrived in Rogers County and delivered my client to the Rogers County Jail. So the body camera runs for over an hour and includes the conversations that the two officers are having and the officers are having with my client. So it's a very enlightening video, although somewhat boring at times. So after Snyder pulls my client out of the car and my client says, what am I being arrested for? He says, you've got warrants. They take him back. They sit him under the hood of the car and they cuff him. Somewhere about this time, his girlfriend is on the scene because she is wanting to drive the vehicle away. Officer Mortensen comes back. Oh, she's wanting to drive it. She wants to. We don't know how she got there. We do not know. Presumably, he must have called her. But how did she get there except drive? That would be my guess, Your Honor. But then she can't drive his car away. That leaves her car there. I would assume so, Your Honor, but none of that is reflected on the camera. You just see her standing there communicating with the officer that she would like to drive the vehicle. Officer Phillips – I'm sorry. After Officer Snyder is back in the car, he's working on his computer to get information typed in for the arrest. Officer Mortensen comes back, puts his head in the car, and asks him something along the lines of, did he say he had marijuana or weed or something like that? And Snyder says, I don't know. Just do an inventory search. And so it comes out in the trial that an inventory search is typically done using a standard Tulsa Police Department form where they can write down the number, the tag number, and examine the body of the car to make sure there's no body damage to it. And none of that occurs with Officer Mortensen. He just gets into the car, promptly sits down. He's reaching under the seat. He's reaching under the dash. He pulls up a piece of plastic that covers the center console, and that's where he discovers a baggie that contains some cocaine-based. He also discovers in the center console a small – he described it as a medicine bottle. It almost looked like a film canister to me, although I don't even have to make those anymore – that contained a small amount of marijuana. I think the entire weight of the container and the marijuana was around 9 grams. There was no weight of just the marijuana alone. He claims he smelled unburnt marijuana, even though he had this minuscule amount of marijuana contained within a plastic container. After they discover the cocaine base, he shows it to Officer Snyder. Officer Snyder, who had been arranging to have my client transported to the city for a traffic violation, now has to change and have him transported to a county facility, which happens to be Rogers County in this case, because they were going to have – it turned out to be a federal or tribal prosecution because my client is a citizen of one of the tribes in Oklahoma. Mr. Campbell, you mentioned a minute or so ago that the officer referenced an inventory search. If the search qualified as a probable cause search – and I know you would argue that, but let's just assume that it does for the sake of this question – does it matter that the officer called it an inventory search? I think if the officer just misspoke and called it the wrong kind of search, then I would agree. Well, even if he thought it was an inventory search, but there was nonetheless probable cause, wouldn't that cure his calling it an inventory search? I'm not sure how many facts you want to assume there are, but in this instance, they're both communicating. Officer Snyder says do an inventory search, and Officer Mortenson does nothing to disabuse him of the idea that an inventory search is the only search appropriate. He doesn't say, well, I smelled alcohol or I smelled marijuana. But their state of mind is irrelevant to whether there's probable cause for a search, and if there was probable cause for a search, then they could perform the search, whatever they thought they were doing. Am I missing something there? Well, they certainly have to have the requisite knowledge in their mind that gives them probable cause. Right, and Judge Egan found that, did she not? Yes, sir, she did have that find. So in answer to Judge Matheson's question, it really didn't matter what they called it or even what they thought they were doing if they, in fact, had probable cause. Your Honor, my argument is that they did not subjectively have the information that gave them the basis for a probable cause search. If they had, they would have mentioned that during the discussion, and Officer Mortenson, who's standing on the passenger side of the window, rolled up above his nose and eyes and mouth, couldn't possibly have smelled anything and certainly didn't have a discussion with Officer Snyder about any probable cause he might have obtained by having a conversation with my client. I will reserve, if the court allows, I will reserve the remaining 45 seconds I have for questions. Thank you. Good morning, Your Honor. Good morning, Your Honor. Shelley Clemmons on behalf of the United States. It may please the Court. Your Honor, in this case, the record clearly demonstrates that the officer has had both probable cause and reasonable suspicion to pull this car over. The video, the body cam, is turned on when the officer begins to stop. You can't see both the dash. But his testimony was that he could see the line of traffic coming towards him. This is not an overly wide road with multiple lanes. There's no median blocking his view. He can see that the defendant is speeding, weaving in and out of cars, and they're going at the right speed. At that point, given both the reckless driving as well as the speeding, he had a probable cause to pull the vehicle over. In addition, based on his prior contacts with the defendant, which he testified some of which were very recent to this current stop, he knew the defendant's license had been suspended or revoked in the past. As the Supreme Court noted in the Supreme Court v. Honorary in Kansas speak letter, it's reasonable in that case for an officer to infer that someone who would drive with a revoked license would continue to do so. And that's reported in the ward. So arguments that the body cam footage doesn't reflect the findings that the district court made are not necessarily supported by the record. For instance, arguments that you can't see the underlying tow hose. However, the testimony was that the speed on that road was 45 miles an hour. And 45 miles an hour, by the time the officer stopped, took off his own seat belt, got out of the vehicle, those cars would have been long gone. And there is absolutely no reason for other vehicles to stick around while he's making a traffic stop of Mr. Phillips. But in terms of the evidence of probable cause, I don't recall ever seeing recitation of facts that were so contrary to what the judge found. Judge Egan is a terrific judge, which makes this all the more surprising. But, for example, you mentioned that he had known the defendant and had had recent contacts with the defendant. But he asked the defendant, what's your name? Don't I recognize you from somewhere? That's not – that makes it a lot harder to believe the officer's testimony that he knew this fellow well and had seen him driving this car a lot recently. Harry, if you look at the video evidence at the beginning of the stop when Officer Schneider first came out through the driver's side window and the window's open, and then he asks the defendant's license, he says, yeah, I got my Creek ID on me. And I believe the officer said to him, yeah, I know you do. Clearly there's a familiarity there. It's not uncalled for that the officer would not call his name right off the bat, as officers make many traffic stops and have many contacts with people. But in this case, the officer clearly has some familiarity with the defendant. And in fact, when Norton stands on the other side of the vehicle and asking the guy to roll over to him, he's like, you know, come on, bud. Like, come on, buddy. He's just acting in a very friendly manner, not like someone who was a total stranger. In addition, the argument that the video doesn't show blocking of the driveway, the judge even found that the car was partially blocking the driveway, which is demonstrated by the video. But you can also see when Schneider gets out of the vehicle, there's cars parked in front of the vehicle up against the building where he stopped. There's a car on the left. If somebody's pulling in, this defendant is partially blocking the driveway at that point. So that finding is not accurate. Why shouldn't they have let the defendant give the keys to his girlfriend so she could move the car? Well, I think that's a matter of timing, Your Honor. The girlfriend was not on the scene when they began the search. She doesn't appear on the video until you see Officer Morton say, I found Joe. I don't know what point she arrived, but it's not until 1626 where there's a first request for the girlfriend to take the vehicle. How far into the conversation? 1626. So they start talking to her at 1530 when she's asking to take the phones, and they tell her no. And then about a minute and a half later, they talk about that. And then the defendant, again, doesn't ask the girlfriend to take the car to his people until 1323. However, at that point, this car was already implicating the crime by the nature of the fact that the officer smelled marijuana coming from it, which distinguishes it from— They actually smelled it, but a lot of their conduct seems inconsistent. There's no communication between the officers of having smelled alcohol or marijuana. There's—in terms of the inventory search, there's no evidence that the owner of the parking lot asked the car to be moved. There's so many things that you'd expect to find in the record that aren't there. How do you account for that? Well, first of all, as anybody who defends counsel, there was a discussion about weed as early as three minutes and 33 seconds into the video where there's a discussion between the two officers to say he had weed on him. Clearly, weed was on their mind. Second of all, this court typically declines to usurp the fact-finding of the court. In fact, in—I think it was the Jones case, this court found that that is more of a subject for cross-examination than necessarily an inconsistency. In that case, the officer didn't mention until nine minutes into the stop that he smelled weed. Could I just ask on the smelling question? We have Officer Snyder saying he smelled both burnt and raw marijuana, which is a pretty good skill set for Officer Snyder to be able to distinguish it at the same time. And Officer Mortenson said he smelled only raw marijuana. Now, why doesn't that weaken the basis for probable cause? Well, you know, I don't think it matters whether they smelled raw or burnt. They both smelled the odor of marijuana. In fact, Mortenson continued to reiterate he smelled the general odor of marijuana, as we know from prior cases. But there is some variance between the two. Would you agree? I would agree, and that could just be a matter of experience, or it could be a matter of the fact that Snyder was standing by the garage side of the vehicle and Mortenson was over at the passenger side. But the fact of the matter is they did, in fact, find marijuana in that vehicle, as well as open containers of alcohol, which justifies their—and corroborates their statements that they did, in fact, smell marijuana as well as the consumption of alcohol. Did they make any statements before they found it? No, Your Honor. But, again, the court had the opportunity to do the videotaping, the testimony of the officers, and she found that they were credible. And, for instance, in U.S. v. Woods, this court declined to overturn the fact-finding and the credibility findings of the court. In that case, where the officers say smell drugs, but omitted it from his report, this court—Judge Egan's findings are supported by the record, even if there was no discussion between officers. She found credible their testimony that they had worked together before and worked in a room. And, as Your Honor pointed out, regardless of whether they called this an inventory, if, in fact—and, in fact, they did have a problem with the cause of the search— searched the vehicle based on the odors coming from it, then, at that point, this court typically does not find some sort of ulterior motive by the fact that they accidentally called it an inventory. Isn't there a problem, if you are relying at least in part on an inventory search, that the business owner concurred in the removal of the car after the search occurred? Well, Your Honor, that would go to whether or not the encounter in an inventory is probable—appropriate. Right. However, one factor that was not present in other cases, including this court's recent decision of Braxton, is that, in fact, at this point, given this odor of marijuana, which was before he spoke with the car owner, or the property owner, based on the marijuana in the vehicle, so at that point it's implicated in a crime. It's evidence in defense for which a search— Well, that's back to probable cause. If you didn't—if your case for probable cause is problematic and your fallback is the inventory search, isn't there a problem in relying on inventory search when the search happens before the business owner says, it's okay, go ahead, it's okay to remove the car? I mean, that's an important factor, isn't it, in determining whether it's a proper inventory search? It is, Your Honor. However, in standards, the court set forth five factors, as well as the three-factor whether there's heightened—the heightened requirements for private property. In this case, as the court found, this car was parked for obstructing traffic. And second, these officers had a reasonable, non-pretextual reason to seize this vehicle. Their TPD policy allowed for the seizure of a vehicle when it commits a crime on public property and then stops in private. They had smelled marijuana in the vehicle, therefore it's implicated in a crime. And in fact, up to that point, again, the officer makes other comments, you know, in the video. He says they're just mad that the he parked here is up in their business. He tells them, hey, we're going to get this out of here quickly. At no point does it appear that the property owner either knew the defendant or was willing to keep the car there. But those factors, the fact that this is actually obstructing traffic, combined with that reasonable reason, that non-pretextual reason to search the vehicle, justify the incumbent inventory. However, the court did not reach this issue because the probable cause was very strong in this case, as was corroborated with the fact that they did in fact find marijuana. If you believe their testimony at the hearing, they had strong probable cause. Are you aware of any cases where this court has said, you know, there's a lot of contrary evidence here. We're not quite sure how you made the fact findings you did, and we've remanded for further explanation by the district court. Do you know if we've ever done that or talked about doing that? Off the top of my head, I'm sure that there are cases that talk about that. However, Your Honor, I would refer you back to Woods, where the court declined to usurp the finding. I would also refer you back to Saratops. But in Woods, as you described it, the inconsistency was the officer didn't put it in his report. Yes. That happens all the time. That's why I said I don't recall any case in which there's so much suggesting poor memory or perhaps lack of veracity by the officers, as in this case. It makes me wonder how Judge Egan found what she did. I respectfully disagree, Your Honor. At the supplemental volume here 2 and 5 in the report, which was written that same day, the officer notes right there in that report that he smoked a little marijuana and had a consumption of alcohol. This is not something that they made up before they came to end up in a preliminary hearing. In addition, Santos, the defendant in that case, argued that the body cam footage didn't support the district court's finding that the defendant was nervous. And in that case, the court said they were not going to usurp the trial of fact. And it made that true that Judge Egan, in this case, not only believed the body cam footage was played for her, but she also heard the entire testimony of the officers and, in fact, heard the same arguments and the same positive information made by the defense counsel today, but instead found that the officers were credible in this particular case. And where there's, you know, defense only views it one way or the other, but where there's two plausible reasons found in the record and the court district court makes one finding, that does not constitute a clear error. Could you spend a minute talking about the reference to the defendants asking for an attorney and how that was used at the trial? Yes, Your Honor. In that particular case, the conditioning factors concluded that that was harmless beyond a reasonable doubt. First of all, the government did not use that evidence. They didn't intend to use that evidence. They asked the question, what was the defendant's demeanor, and unfortunately got a statement from the officer. But they immediately backed away from it. They did not refer to it in a future argument or any cross-examination. And in addition, the defense, the judge in this case, gave a curative instruction, a very strong curative instruction, reminding the jury that every person has this right, it's a constitutional right to ask for a lawyer, there's nothing wrong with that, that although he may have said it, it was his constitutional right to do so, and he instructed the jury to disregard the testimony. There was something about the defendant was going to put on the evidence that he had requested an attorney anyway. He was going to show that part of the video. What's the record show in that regard, or am I misrecalling? He did say there was a testimony sidebar that that was perhaps one of the sections that he had included on his exhibit list. The record is a little vague about what was played in regards to what the defendant played. However, Snyder testified that the first five minutes of the video showed him stopping the defendant and then up to the arrest. And right before he places the defendant at arrest, you hear Mortensen say across the car, hey, he wants an attorney. And his defense counsel said, sidebar, he did not have a problem with the defendant or with the jury hearing the defendant ask for an attorney. He just didn't want the government to use his argument as evidence of guilt, which, in fact, in this case, the government didn't. Given the curative instruction and the strength of the evidence, in fact, the government didn't use it to its advantage or argue it further. In this case, any error was clearly on a harmless view until now. Court has no further questions. I realize your time has expired. Yes, thank you, Counsel. You have a little less than a minute. Yes, Your Honor. I wanted to talk very briefly about Officer Snyder bringing up my client requesting an attorney. As is mentioned in the written record, the sidebar in my counsel, I did play a video where it is clear my client asked the two arresting officers for an attorney. And I don't think that's irrational. I didn't think that prejudiced him in any way, so I was comfortable with the jury seeing that on the video. My concern was, as Officer Snyder was asked, was there anything different about his demeanor this time in the arrest? He had asked him because he had talked about other times he saw him. And the reason he was allowed to ask about other times is because the United States was trying to show they had driven this vehicle on multiple occasions. In this instance, he said the difference was this time he asked for a lawyer, which Trump was trying to show a guilty moment. Thank you. Thank you, Counsel. Yes, Your Honor.